## NEW JERSEY BELL TELEPHONE CO. et al. v. BOWER.

### No. 4686.

District Court, D. New Jersey.

June 14, 1934.

Thompson & Hanstein, of Atlantic City, N. J., for complainants.

George R. Greis, of Ocean City, N. J., for defendant.

AVIS, District Judge.

This action is instituted by four corporations, two of them being New Jersey Bell Telephone Company and Ocean City Water Service Company, both corporations of, and operating as public utility corporations in, the state of New Jersey; the third, the Agincourt Land Corporation representing the Jersey Central Power & Light Company, a utility corporation operating in the state of New Jersey; and the fourth, the Franklin Real Estate Company, representing the Atlantic City Electric Company.

Complainants allege that each of these corporations loaned $12,500 to the First National Bank of Ocean City (hereinafter called bank) in the early part of the year 1932 (a total of $50,000); that these cash loans were secured by four mortgages executed by Ocean City Securities Corporation and delivered to each of the complainants in the sum of $12,500 each, being concurrent second liens upon certain real estate of mortgagor, subject to a first mortgage of $100,000 held by Camden Safe Deposit & Trust Company. It is further alleged that the real estate so mortgaged was sold under foreclosure of the first mortgage, and the equity of the second mortgages in said real estate extinguished; that First National Bank of Ocean City was subsequently declared insolvent by the Comptroller of the Currency, and a receiver appointed; that claims, as common creditors, were filed by each complainant, and rejected by the receiver. The bill recites the institution of a suit at law in this court by complainants against defendant, the filing of an answer by defendant, setting up the defense that the claimed moneys were not due from the bank, but that the loans were made to the Ocean City Securities Corporation.

The bill then alleges that the stock of the Ocean City Securities Corporation is, and was, entirely owned by the bank,

and that the bank is liable directly, or as the holder of all of the stock of the affiliate or subsidiary.

The bill alleges that the defense interposed is inequitable and prays:

(1) For subpœna.

(2) For restraint against receiver, enjoining him from asserting this defense in the action at law.

(3) For a decree that the moneys were loaned to the First National Bank of Ocean City.

(4) For an adjudication validating the claims filed with the receiver.

(5) That the receiver make discovery and disclosure concerning the relationship between the bank and Ocean City Securities Corporation.

(6) That the receiver make discovery and disclosure of the facts and circumstances under which he claims the Ocean City Securities Corporation borrowed the money referred to therein.

The answer filed admits the general facts, but in the answer and defenses denies the obligation of the bank to pay, and claims that the moneys advanced by complainants were advanced upon the security of the mortgages to be executed by Ocean City Securities Corporation, and that there was no understanding by the bank, or any legal or valid obligation of the bank, to pay any of the moneys so advanced.

The court has some doubt as to the equities of the bill, but in view of the fact that no contention on this question is raised by defendant, that the prayers of the bill appear to be so framed as to dispose of the entire controversy, and that 'the pleadings, proofs, and argument of both litigants indicate the intention of all parties to dispose of the entire controversy in the instant case, the court will decide the case on its merits.

It appears that in the fall of 1930 the bank took over the assets and assumed the obligations of the Ocean City Title & Trust Company, a banking institution of Ocean City, N. J. Included in the assets was all of the stock of a subsidiary company, the Ocean City Securities Corporation, which held the title to the land at the southerly corner of Eighth and Asbury avenues, Ocean City, upon which was erected a large building, the first floor of which was adapted to, and used for, banking purposes.

The other floors were rented for business and office purposes to sundry corporations and individuals. Upon this purchase or merger the bank moved from its banking building diagonally across the street to the larger building, and established its banking business therein, and apparently assumed more or less control over the larger building.

In the fall of 1931 the bank's then president died, his body being discovered on the beach at Ocean City, and, because of the sudden death of the president, the board of directors of the bank, fearing a demand from depositors, by resolution closed the bank, and at the request of the board, the Comptroller of the Currency placed an examiner, one F. T. Ransom, in charge thereof. The bank was closed until March 22, 1932, when it reopened unconditionally.

For the purpose of obtaining the consent of the Comptroller to reopen, it became necessary for the bank to raise approximately $900,000 in cash, and, having obtained approximately $850,000 from other sources, the then officers of the bank, together with the examiner, conceived the idea of applying to the four utility companies doing business in Ocean City to contribute $12,500 each to complete the necessary fund. William J. Collisson, a director, and then acting president of the bank, and Reuben Edwards, a director of the bank, were selected to call upon the representatives of the various corporations to endeavor to obtain the required balance.

Mr. Edwards, because of illness, was not produced as a witness, but Mr. Collisson testified that Mr. Edwards accompanied him on the visits and was present when the propositions were submitted. The first conference was held with Mr. Henry Schanze, representing the Jersey Central Power & Light Company, and Mr. Bayard England, representing the Atlantic City Electric Company. The witness testified that he asked these parties if "they would ascertain if a second mortgage of $50,000 could be obtained from two of those companies." He further said that he "explained to them we had expected to receive $150,000 from the Camden Safe," and, answering a question, "You meant who?" said: "The First National Bank, and I expected that that would go through. We found that we were $50,000 short and it was necessary to raise

$50,000 additional. Mr. England suggested that I see his immediate superior, Mr. Lewis, general manager at Atlantic City, and a conference was arranged in which Mr. Edwards, Mr. England and myself conferred with Mr. Lewis about this same matter." Pages 12 and 13 of Record.

The witness saw Mr. Lewis, and testified as to the conversation as follows: "We told him that the First National Bank wanted to raise $500,000 and told him the story of how much we had raised, our prospects of reopening, and that we needed $50,000 from the utilities on the second mortgage. We told him that the First National Bank would give them security in the form of a mortgage on a building, which was the Trust Company building." Page 13 of Record.

The next company contacted by the witness was the Federal Water Company, where they saw a Mr. William Edwards, and the witness said: "The same story was related to them." Page 15 of Record.

They next contacted representatives of the New Jersey Bell Telephone Company, conferring with Mr. Barnard, the president, and as to this conference the witness said: "One week later from the date of our visit with Mr. Lewis we went to Newark and conferred with Mr. Barnard, the president of the New Jersey Bell Telephone, and stated that we had interviewed the Gas Company, the Atlantic City Electric Company and the Federal Water Company, and were given hopeful assurance they would participate, and we needed the New Jersey Bell Telephone to subscribe to their quarter to make the same complete; that the First National Bank needed the $50,000 and that they would be given the same security that the other utilities would be, which would be a second mortgage on the building we expected to open in." Pages 15 and 16 of Record.

On cross-examination, with relation to the representations made by him to the various companies, Mr. Collisson testified:

"Q. Mr. Collisson, you were required no doubt to explain in detail your plans for operating this building, were you not, to the people who took this mortgage? A. I do not recall, Mr. Greis, that that matter was gone into. The discussion was the security over and above the $100,-000 first mortgage rather than the operation.

"Q. And what security did you tell these representatives of these utility companies that they would get for their $50,-000? A. That they would get a second mortgage on this building built and constructed by the Ocean City Title & Trust Company, now owned by the First National Bank—I am speaking of the time of which I am talking—and that their mortgage would be a second mortgage, with a $100,000 first mortgage held by the Camden Safe." Pages 22 and 23 of Record.

When Mr. Collisson had completed his work, he reported to the examiner and advised him, " 'Here is the companies and the amount of money they will give, and I have offered them a mortgage on the Trust Company building.' " Page 107 of Record. He testified that he did not complete the contract, all that he did was to get the utilities and make arrangements for the money, and after he reported Mr. McMullin came into the picture from that time on.

These statements are the voluntary ones made by the witness when called upon to state what he told the various parties when applications were made for the money. The witness, in reply to direct questions, some of them leading, did say that the bank borrowed the money, and made some other statements to similar effect. Practically the same statements were made in the testimony of the representatives of the various companies who were interviewed. There was no testimony to indicate that the bank was to be responsible for repayment, or that any action of its board of directors authorized its president or directors to bind it in such a manner.

The claim of complainants is rested upon the testimony of Mr. Collisson, and the testimony of the representatives of the complainants with whom he conferred. Mr. Collisson testified that his efforts to obtain the advances were under the direction of the examiner, and that report was made to him. It is to be regretted that we do not have the benefit of the testimony of Mr. Ransom, the examiner, or of Robert K. Bell and Roland Steelman, who signed the bonds and mortgages as president and secretary of the Ocean City Securities Corporation. These parties, or some of them, ·apparently in close touch with the transaction, should

have had some knowledge of the nature of the negotiations.

It appears by the testimony of John D. McMullin, an attorney, who was representing the directors and examiner, that he was in charge of the final negotiations with relation to the advancement of the cash, the giving of the mortgages, and, it seems, the final arrangements for securing the loans.

He testified that to get the permission of the Comptroller to reopen, it was required that this $50,000 should be a clear asset without any corresponding obligation on the part of the bank, and that neither the reports to the Comptroller nor the books of the bank showed any charge indicating that the $50,000 so advanced was an obligation of the bank.

It appears that the checks of the various companies were delivered in escrow to Mr. Ransom between January 19, 1932, and February 16, 1932. Prior to the first date, the mortgages had been executed and recorded, and Mr. McMullin testified that, before the date of delivery of the first check, he had communicated by letter with all of the complainants, or their attorneys, advising them that the bank could not become a debtor for the amounts advanced; that such action would make it impossible for the bank to accomplish the purpose for which the moneys were advanced, and, as I view it, distinctly advising the interested parties that the bank could not assume a legal obligation to repay.

▇▇▇ The evidence generally satisfies me that the advances were made only upon the security of the mortgages. The burden is upon the complainants to prove their case by a preponderance of evidence. Considering the testimony of Mr. McMullin, the fact that no obligation was given by the bank, that no direct promise of the bank to pay was made by Mr. Collisson, that no evidence of any action taken by the board of directors was produced, and that the checks were delivered after the letter of Mr. McMullin was sent, in which it was stated that the bank could not assume legal liability, I have come to the conclusion that there was no legal obligation on the part of the bank to repay the moneys advanced. Particularly is this true by reason of the bank's insolvency, and the provisions of the statute with relation to the distribution of the assets of insolvent national banks. There are some intimations in the proofs that the bank would take an assignment of the mortgages, but this was only a suggestion, and did not become a contract binding upon the bank or its receiver.

Counsel for complainants suggest in their brief that, because of the fact that the bank owned all of the stock of the Ocean City Securities Corporation and received the benefits from the moneys advanced, it is legally bound to repay the advances, and cites sundry cases to sustain this contention. I have examined the cases cited, and in certain instances, under the circumstances in each case, it appears that this doctrine has at times been established; but this does not apply to the instant case, holding, as I do, that there was a distinct understanding that the bank should not be legally bound to repay.

I find as facts:

(1) That each of complainants advanced the sum of $12,500 for the use of the bank, upon the understanding that this sum was required to permit the bank to reopen.

(2) That each of the complainants received as sole security therefor a bond of the Ocean City Securities Corporation, accompanied by concurrent mortgages to secure the amount so advanced, on property of the said Securities Corporation in Ocean City, N. J.

(3) That the property upon which the mortgages were a lien was, at the time, considered of a value in excess of all encumbrances.

(4) That it was believed, at the time of the advance of the money, that the bank would be re-established on a solid basis, and eventually repay the advances by purchasing the aforesaid mortgages.

(5) That no evidence of indebtedness was given, or intended to be given by the bank, to the complainants, or any of them.

(6) That no entry was made in the books of the bank showing that the complainants, or any of them, were creditors of the bank.

(7) That there was no action on the part of the directors of the bank, or any other person having lawful authority to bind the bank, by which an agreement was consummated, making the bank or its receiver responsible for repayment.

My conclusions of law are:

There being no contract, express or implied, on the part of the bank to borrow on its credit, or to repay the amounts advanced, the complainants cannot recover.

The restraint prayed for in the bill will be denied, and, the other matters at issue being herein decided adversely to the prayers of the bill, it will be dismissed.